UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

HOWARD HAWK WILLIS,                    )
                                       )
           Plaintiff,                  )
                                       )
v.                                     )        NO. 2:09-CV-116
                                       )        *Greer/Inman*
DANIELL DRAPER, SOUTHERN               )
HEALTH PARTNERS, OFFICER               )
CHAD JOHNSON, SHERIFF ED               )
GREYBEAL, DISTRICT ATTORNEY            )
TONY CLARK, and CAPTAIN BILL           )
BURT,                                  )
                                       )
           Defendants.                 )

## MEMORANDUM and ORDER

Acting *pro se*, Howard Hawk Willis, a pretrial detainee in the Washington

County Detention Center (WCDC), brings this civil rights action for injunctive,

declaratory, and monetary relief under 42 U.S.C. § 1983, asserting that he has been

subjected to unconstitutional conditions at the WCDC and that his rights have been

violated in connection with his pending state criminal proceedings.

### I. **Screening.**

The Court now must screen the 72-page, 12-count amended complaint (Doc.

8) to determine whether it should be dismissed as frivolous, malicious or for failure to state a claim or because monetary damages are sought from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2) and § 1915A.

## II. **The Claims**

A. Claim one (Medical Care).

In his initial claim, plaintiff contends that he has been denied medical care for a thyroid condition, Hepatitis C, and back problems. He offers the factual allegations which follow to support his claim.

—*Thyroid condition*: Plaintiff has a thyroid problem, and at one time, was taking a synthetic thyroid supplement, which caused him to have blurred vision, disrupted sleep patterns, and a racing heart, and to "feel funny" in his head. However, since January 2006, he has been treated with an organic medication and has experienced no side effects from this medication. On December 16th or 17th of 2009, after advising Dr. Pinyard, the jail physician, of the problems he was experiencing with the synthetic medication, which was being substituted or attempted to be substituted for his usual thyroid medication, plaintiff asked the doctor to order that he be given only organic thyroid medication. Dr. Pinyard responded that he would "tell his boss." Plaintiff found this odd since Dr. Pinyard knew that plaintiff had side effects from the non-organic thyroid medication and, as a licensed physician in

Tennessee, is authorized to write the requested order.

—*Hepatitis C*:  During the same conversation, plaintiff informed Dr. Pinyard that, in November, 2006, while he was undergoing a psychological evaluation at a mental facility in connection with his state criminal proceedings, he was diagnosed as having Hepatitis C Virus (hereinafter HCV).  Plaintiff explained that, upon his return to the WCDC, he was retested for the disease—with positive results—and referred to a specialist, who advised him to get Hepatitis A and B vaccinations from his family doctor.  When plaintiff visited his family doctor, the doctor told him that he had no vaccine in stock, but that he would write a prescription so that plaintiff could get vaccinated at the jail.

Pat Hollyfield, the WCDC employee who had referred plaintiff to the specialist and to his family doctor, agreed to give him the vaccine, but only if he paid for it himself.  Later, when he asked Dr. Pinyard about the immunizations, the physician informed plaintiff that he would delegate that task to defendant Head Nurse Daniell Draper.  After a period of time, plaintiff inquired about the vaccines and was told that Nurse Draper said there were no records of plaintiff having HCV or taking any medication.  Since plaintiff had in his possession copies of his WCDC medical records (obtained in connection with his state criminal case) and since they contained nothing to indicate that he had HCV, as Nurse Draper had correctly stated, plaintiff deduces

that someone has tampered with his medical records.

—*Back Problems*:  Plaintiff has taken 800 M.G. of Ibuprofen daily since he had back surgery in 1991, but defendant Southern Health Partners assumed the duty to provide medical care to WCDC inmates and now dispenses this anti-inflammatory to him only fifteen days per month.   This is significant because his medical records, including those from a federal prison, detail his back surgery and show that his family doctor prescribed 800 M.G. of Ibuprofen. When plaintiff inquired, personally and through means of a grievance, about receiving his Ibuprofen daily, instead of every other day, his request was rejected based on "SHP (Southern Health Partners) protocol."

1.  <u>*Applicable Law*</u>

"Punishment" can be extended beyond that which is part of a sentence and can include the conditions under which an inmate is confined; thus, a prison authority's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (1976).  An Eighth Amendment claim has both an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The objective component requires the plaintiff to show a "sufficiently serious" deprivation.  *Id.*  A medical need may be objectively serious if even a lay person would recognize the seriousness of the need for medical care.  *Johnson v.*

*Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (citing *Blackmore v.Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). The subjective component requires a showing of a sufficiently culpable state of mind—one of deliberate indifference. *Farmer*, 511 U.S. at 842.

Prison officials are deliberately indifferent to a prisoner's serious medical needs when they "interfere with treatment once prescribed." *Estelle*, 429 U.S. at 104-05; *Lawson v. Dallas County*, 286 F.3d 257 (5th Cir. 2002) (finding deliberate indifference where doctors sent specific orders to jail medical staff, but nurses failed to follow those instructions despite their actual knowledge of the seriousness of an inmate's condition); *Tatum v. Winslow*, 122 Fed.Appx. 309, 310, 2005 WL 95852, *1 (9th Cir. 2005) (finding that an inmate had pled a constitutional violation by alleging that the supervisor of a prison medical care system denied and delayed treatment for his HCV infection). Also, "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering." *See Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998) (citing *Boretti v. Wiscomb,* 930 F.2d 1150, 1154-55 (6th Cir.1991)); *see also Estelle*, 429 U.S. at 103 ("[The denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.").

However, where a prisoner receives some medical care and the dispute is over

its adequacy, no claim has been stated. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). By the same token, no viable Eighth Amendment claim is stated by allegations that a medical condition has been negligently diagnosed or treated, and the mere fact that the victim happens to be a prisoner does not convert it into a constitutional violation. *Estelle*, 429 U.S. at 106. Nor does a disagreement with medical care providers as to appropriate treatment for an inmate's ailments present a constitutional controversy. *See id.* at 105-06; *see also Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir.1997) (disagreement between prison physician and physician who originally prescribed medications not of constitutional magnitude).

2. *Analysis*

—*Thyroid condition*: Responding to plaintiff's grievance dated February 23, 2009, Nurse Draper stated that plaintiff was brought to the Medical unit that same day to discuss medical issues and that, regarding his thyroid medications, "we will order Organic med due to other causing I/m headaches per Dr. Allen's office." (Am. Compl., Ex. 9) (exhibits available in Clerk of Court's file). Plaintiff's own allegations are that "at random and different times out of pure negligence," he was given synthetic medication even though the medical staff knows of his adverse reaction to that medication. (Am. Compl. at 11, ¶4). As explained, because a prison official's actions must be more than mere negligence, and if the official took reasonable measures to

abate the harm, he will not be held liable, even if the harm was not ultimately averted. *Farmer*, 511 U.S. at 835-36. According to plaintiff's own submissions, the organic medication was ordered and, even though he was occasionally given synthetic medication, this was done, as he acknowledges, "out of pure negligence." *See Estelle*, 429 U.S. at 106 (negligence is not a constitutional violation). Having failed to show the subjective component of an *Estelle* claim, plaintiff has failed to establish any entitlement to relief.

—*Hepatitis C*: Plaintiff alleges that his family doctor ordered that he receive vaccinations for Hepatitis A and B and that he was denied these immunizations. To back up his allegation, plaintiff has submitted copies of: (1) the results of a November 2, 2006, blood test from Quest Diagnostics, ordered by a physician at the Middle Tennessee Mental Health facility in Nashville, Tennessee, which shows that he is highly reactive for Hepatitis C antibodies, (2) a prescription, dated December 19, 2006, from the Castle Clinic, ordering that plaintiff be given Hepatitis A vaccine "as directed" and Hepatitis B vaccine, and (3) a February 23, 2009 grievance complaining about not receiving the vaccinations. (Am. Compl., Exs. 2, 3, 8). At the bottom of the grievance is written this response: "Dr. Allen's nurse-Connie states these are NOT life threatening[.] Therefore, I/M can have family or someone of his chose [sic] to pick-up medication from a pharmacy [and] it w[ill] be given [at] that time."

"[A] *pro se* complaint that alleges deliberate indifference to a prisoner's medical needs is to be liberally construed." *Byrd v. Wilson*, 701 F.2d 592, 594 (6th Cir. 1983) (citing *Estelle*). There may be issues involving this claim, i.e., timeliness, but nothing submitted thus far suggests that plaintiff's liver infection has been cured or that the physician who prescribed the vaccines has rescinded his 2006 order. Therefore, interpreting this *pro se* prisoner's pleading indulgently, he arguably has stated a constitutional claim for deliberate indifference to serious medical needs.

—*Back Problems*: Plaintiff contends that he is locked in his cell for 22 hours a day and can only sit or lie down during this time, but that, because of his back problems, he cannot sit without irritating the nerves, which inflames them, and that, when this occurs, he has pain down his left leg to his knee. Plaintiff alleges that he can sit and has no pain when he takes a daily dosage of 800 M.G. of Ibuprofen, but that, due to the decrease in the medication from every day to every other day (or, if he chose, to fifteen straight days a month), his back is "all to pieces" and he can get up only with assistance. According to the February 23, 2009 grievance, he raised the issue and stated that he could purchase only a 2 ½ days' supply of Ibuprofen per week. In Nurse Draper's written review, she states that plaintiff was brought to the medical clinic to resolve his medical issues, that, during their discussion, plaintiff insisted that he had records saying that he could have the Ibuprofen daily, and that, in response, she

explained to him that it did not matter what kind of paperwork he had, "this is the SHP protocol." (Am. Compl., Ex. 8 at 2).

Among plaintiff's many submissions is a copy of a surgical report, dated June 19, 1991, showing that plaintiff had a lumbar laminectomy and a disc excision, with no complications; a copy of a Report of Medical Examination, signed November 13, 2002, by Michael Borecky, M.D., which notes that plaintiff's medications include twice daily doses of 600 M.G. of Ibuprofen; and a copy of a Castle Clinic prescription, dated December 19, 2006, for 100 Motrin 800 M.G. tablets three times a day. The prescription was eligible to be refilled for one year only. (*Id.*, Exs. 3-5).

Though plaintiff has had back surgery in 1991, he does not contend that he was refused care for his back at the WCDC. Indeed, by plaintiff's own allegations, he has received a great deal of medical attention for his ailments, including medication to treat his back pain. Essentially, his claim is that he was not given the amount of medication that he desired. But a disagreement between a prisoner and his medical care provider concerning treatment does not state a cognizable Eighth Amendment claim. *Estelle*, 429 U.S. at 107. By the same token, allegations that a medical condition has been negligently diagnosed or treated are not actionable under § 1983, and the mere fact that the victim happens to be a prisoner does not convert what, at best, is a medical malpractice claim into a constitutional violation. *Id.*, at 106. For

this reason, the plaintiff's claim that he was denied a specific dosage of Ibuprofen fails to state a viable claim entitling him to relief under § 1983. *See Layne v. Vinzant*, 657 F.2d 468, 473 (1st Cir. 1981) (finding that "[t]he right to be free from cruel and unusual punishment does not include the right to treatment of one's choice").

B. Claim two (First & Sixth Amendments).

1. *Legal Mail*

In this claim, plaintiff alleges that, in violation of his constitutional rights, his incoming legal mail has been opened outside his presence and read and that his outgoing legal mail has been tampered with more than once. The interference began, according to plaintiff, in July of 2003, and despite the issuance of a September 5, 2003 protective order by the state criminal court judge to forestall any mail tampering, the interference has continued. When his attorney refused to file contempt of court charges to draw the state court's attention to the violation of its protective order, plaintiff wrote letters of complaint to the Board of Professional Responsibility and to the Criminal Court of Appeals.

In early 2007, plaintiff discussed the above matter with a WCDC official, Captain Billy Mitchell, and they developed a system to circumvent the alleged mail interference—using an intermediary, plaintiff's pastor, Reverend Roger Warfield, to drop off and pick up plaintiff's legal mail. The plan worked well until March 15,

2009.

On that date, Rev. Warfield dropped off an evelope, which defendant Chad Johnson delivered to plaintiff, while the minister waited in the WCDC's reception area for plaintiff's outgoing legal mail to be brought out to him. Plaintiff had a brown envelope, containing evidence to be presented to this Court, ready for pick up and a white envelope, containing a letter to be faxed to Attorney Smith, almost ready for pick up. However, from the moment the cell door was opened, defendant Johnson stood outside it and verbally harassed plaintiff, called him names, and threatened him with bodily harm for filing a lawsuit against "medical." When plaintiff readied the white envelope, he marked both envelopes with the word "legal" and gave them to defendant guard to take to Rev. Warfield. Before leaving with the envelopes, defendant taunted plaintiff by saying that he was going to make the minister wait an hour to pick up the mail.

Plaintiff contacted another officer to advise him about the situation. Later, that officer called back to report that defendant Johnson was in the reception area and that Rev. Warfield had been given the envelopes. Plaintiff, however, maintains that, afterwards, he telephoned Rev. Warfield, who related that he had been given only one envelope on that day and had to come back to the WCDC the next morning for the other envelope. At any rate, shortly thereafter, defendant Johnson returned to

plaintiff's cell, stood outside the locked cell door, and told plaintiff that he could get the door "popped"and "would whip [his] a_ _."

Plaintiff complained mightily about this incident, and on March 17, 2009, requested a  grievance to file against Officer Chad Johnson, explaining that "this problem will not go away and will not be covered up."  (Am. Compl., Ex. 15).  The following day, defendant Johnson returned to plaintiff's cell to talk to him about the complained of episode.  Plaintiff refused to discuss the matter with defendant guard and instructed him to leave his cell.  Defendant Johnson did not leave the cell, but continued to try to coax plaintiff to talk to him, until plaintiff screamed at him, called him a name, and ordered him out of the cell.

The next day, plaintiff's request for a grievance was denied by Officer Lowe, who stated that plaintiff had failed to specify facts warranting a grievance.  Officer Lowe also stated, in his response, that defendant Johnson had completed his job correctly and had taken the paperwork to reception so that Rev. Warfield did not have to wait for it.  Also, Officer Lowe's opinion was that Officer Johnson had gone "above and beyond" his duty in coming to discuss and, hopefully, to resolve the matter with plaintiff and (impliedly) had refrained from issuing plaintiff a disciplinary report for disrespect, though such a report would have been justified. The Court infers, from the above allegations, that plaintiff is raising four sub-claims.

a) *Verbal Abuse & Threats*:  In the first of these sub-claims, plaintiff contents that he was verbally abused and threatened by defendant Johnson.  These allegations, assuming they are true, manifest behavior on the part of the officer defendant which is downright unprofessional and is likely a violation of the WCDC rules of employee conduct.  But, unfortunately for plaintiff, such deportment is not actionable under § 1983.  "'Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment.'" *Johnson v. Unknown Delatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (quoting *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987)).

Though harassment and verbal abuse are denigrating and doubtlessly unpleasant, these things do not comprise the type of infliction of pain reached by the Eighth Amendment.  *Id.* (citing *Ivey*, 832 F.2d at 954-55).  Put simply, plaintiff has no protectable right not to have threats made against him or verbal abuse directed towards him.  *See Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) (finding that a federal right must be actually denied, not merely threatened); *see also Ivey*, 832 F.2d at 954-55 (explaining that verbal abuse is not recognizable under § 1983).  Thus, this claim lacks an arguable basis in law and is frivolous within the meaning of 28 U.S.C. § 1915(d).

b) *Court Access*:  In the second sub-claim, plaintiff asserts that he was

denied his right of access to the courts. Plaintiff's primary complaint in this regard is that, on March 15, 2009, he handed two envelopes containing legal mail to defendant Johnson to be delivered to plaintiff's designated go-between, Rev. Warfield, who was waiting in the reception area, but that the Reverend received only one envelope that day and had to return the next morning for the other one.

A prisoner has a First Amendment right "to petition the Government for redress of grievances," and this includes a right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). In order to succeed on a claim for denial of access to the courts, plaintiff must show that he has actually been impeded in his efforts to pursue a non-frivolous legal claim regarding his conviction or conditions of confinement. *Lewis v. Casey*, 518 U.S. 343, 351 (1996). This means that plaintiff "must plead and prove prejudice stemming from the asserted violation. Plaintiff[] must demonstrate, for example, that the [alleged infringement of his right] caused such actual injury as the late filing of a court document or the dismissal of an otherwise meritorious claim." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (citing *Lewis*).

Plaintiff has not alleged that he has been prejudiced in filing this instant suit involving wrongful confinement conditions or has suffered any "litigation related detriment" to either this case or his pending state criminal case. *See id.* Thus, because plaintiff has not shown that he has sustained an actual injury in his efforts to litigate

a non-frivolous claim, he fails to state a claim for denial of his right of access to the courts.

c) *Communicative Rights*:  The third sub-claim concerns a purported violation of plaintiff's First Amendment right to communicate with others, specifically, his right to send and receive legal mail.  Plaintiff maintains that since July, 2003, his incoming legal mail has been opened outside his presence and read and that his outgoing legal mail has been tampered with more than once.  These contentions of First Amendment infringements, i.e., those dating back to 2003, lack any factual elaboration, such as the identity of the violators, the date of the supposed violations, or any other particulars describing specific incidents of mail interference. Plaintiff might have presented these general allegations merely to provide background information, but to the extent that he advances them as constitutional claims, absent any contentions of fact, the claims are conclusory.  Conclusory allegations do not state a claim for relief under § 1983.  *Harden-Bey v. Rutter*, 524 F.3d 789, 796 (6th Cir. 2008) ("[I]n the context of a civil rights claim, . . . conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim.") (citing *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 726 (6th Cir. 1987)).

Further, plaintiff admits that the legal-mail system he and Captain Mitchell concocted in early 2007 (i.e., using Rev. Warfield as a go-between for plaintiff's

correspondence) ran smoothly for several years. "[T]he plaintiff continued to release papers without a problem until Sunday, March 15, 2009[.]" (Am. Compl. at 15). Thus, plaintiff is not claiming that any constitutional infringements involving his legal mail occurred from 2007 until March 15, 2009, but, if he were, any First Amendment violations which happened before March 15, 2008, would be barred by the applicable one-year statute of limitations for filing section 1983 actions in Tennessee. *See Porter v. Brown*, 289 Fed. Appx. 114, 116, 2008 WL 3838227, *2 (6th Cir. 2008) ("[O]ur precedent has long made clear that the limitations period for § 1983 actions arising in Tennessee is the one-year limitations provision found in Tenn.Code Ann. § 28-3-104(a).").

Even so, "[t]he right of a prisoner to receive materials of a legal nature, which have impact upon or import with respect to that prisoner's legal rights and/or matters, is a basic right recognized and afforded protection by the courts . . . ." *See Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996). An inmate's legal mail is entitled to a higher level of protection than ordinary mail, *Jones v. Caruso*, 569 F.3d 258, 267 (6th Cir. 2009) (citing *Sallier v. Brooks*, 343 F.3d 868, 873-74 (6th Cir. 2003)), though, "short, non-content based delays in prison mail are not unreasonable and fail to state a constitutional question." *Cotten v. Schotten*, 114 F.3d 1186, 1997 WL 299386, 1 (6th Cir. June, 4, 1997) (citing *Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987)).

To establish a constitutional violation a plaintiff must show regular and unjustifiable interference with his mail. *Davis v. Goord,* 320 F.3d 346, 351 (5th Cir. 2003).

Here, plaintiff has alleged a one-time, brief delay in handing over his legal mail to Rev. Warfield, but there is nothing from which to infer that such a delay was customary, instead of a single isolated incident—indeed, as noted, plaintiff alleges that the system functioned well before this episode. *Morgan v. Montanye*, 516 F.2d 1367, 1370-71 (2d. Cir. 1975) (finding no cause of action for damages under § 1983 for a single instance of interference with prisoner's legal mail).

Another assertion contained in this sub-claim is that, since mid-2003, plaintiff's incoming mail from various attorneys, the United States District Court, the mitigation specialist assigned to his case, and the Margrete Robinson Advocacy Center have been opened outside his presence and read, though these things were clearly legal mail. However, plaintiff does not identify the wrongdoer(s), does not indicate when any of this occurred, and does not mention whether the communications were clearly marked as being legal mail which was to be opened only in the presence of the inmate recipient. Since there are no allegations linking any of the defendants to the opening of plaintiff's mail and since, if there had been such linkage, the date of the alleged mail interference is almost seven years ago, i.e. "around July 8, 2003" (Am. Compl. at 13), this particular claim is conclusory, and untimely as well.

Also, absent allegations as to the identity of the culprit(s) and a date certain as to when the constitutional injury occurred—or more specific than a 6-year and 9-month span of time—a defendant could not frame or reasonably be expected to frame a response. While "[a] complaint need not set down in detail all the particularities of a plaintiff's claim," still it must give a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Lillard*, 76 F.3d at 726 (internal quotation marks and citation omitted). Thus, this claim cannot survive the screening process.

d) *Retaliation*: Plaintiff's fourth sub-claim arose out of the March 15, 2009 incident, which involved Officer Johnson's purported threats of physical harm and of making the minister wait an hour to pick up plaintiff's legal mail. Though defendant Johnson was supposed to deliver the mail immediately to the waiting Rev. Warfield, the Reverend allegedly had to return to the WCDC the next morning to collect the letter plaintiff had written to his New York attorney.

"Retaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment." *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994). "[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir.

1998) (citation omitted).  A prisoner states a retaliation claim if he shows that (1) he engaged in protected conduct, (2) an adverse action was taken against him which would deter a person from ordinary firmness from continuing to engage in such conduct, and (3) the adverse action was motivated by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Plaintiff has alleged that he was threatened for filing a lawsuit against "medical;" such a filing constitutes conduct which is protected by the Constitution. *Lewis*, 518 U.S. at 355.  Thus, plaintiff has satisfied the first element of a retaliation claim.  However, missing from this claim are contentions which would demonstrate the second element—an  adverse action which would deter a person of ordinary resolve from engaging in the protected conduct.  "It is not necessarily true . . . that every action, no matter how small, is constitutionally cognizable" and " certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations . . . ."  *Id.* at 396, 398.  It is noteworthy that plaintiff has not claimed that this or any other named defendant opened or read the outgoing legal mail before it was delivered to Rev. Warfield.

While the behavior alleged here is no cause for celebration, the Court cannot conceive of any inmate of ordinary resolve who would be dissuaded from exercising his right to pursue legal action because of defendant Johnson's claimed conduct. *See*

*Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) ("The factual question is whether the injury inflicted is so slight that it could not reasonably be expected to deter protected conduct.").  A threat of unexplained bodily harm, followed by a delay in handing over legal mail to a chosen intermediary, is simply not one of those "solely egregious retaliatory acts" which amount to a constitutional violation.  *Id*. at 396; *see also Smith v. Yarrow*, 78 Fed.Appx. 529, 543, 2003 WL 22400730, at *12 (6th Cir. Oct. 20, 2003) (affirming dismissal of retaliation claim, "not because threats are never actionable, but the underlying conduct (a transfer) does not constitute adverse action"); *Cf. Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir.2005) (A retaliatory inter-prison transfer is an adverse action where it has foreseeable, negative effects on the inmate, i.e., the loss of a high-paying job and moving him further from his attorney, which limits meetings between them); *Atkinson v. Taylor*, 316 F.3d 257, 270 (3d Cir. 2003) (Allegations that an inmate was transferred to administrative segregation and denied food and access to legal materials to punish him for filing a lawsuit states a claim for retaliation.); *DeWalt v. Carter*, 225 F.3d 607, 619 (7th Cir. 2000) (An inmate's allegation that he was fired from his prison job because he filed a grievance states a First Amendment claim.); and *Thaddeus-X v. Blatter*, 175 F.3d 378, 398-399 (6th Cir. 1999) (An inmate stated an "adverse action" where he alleged harassment, physical threats, and a transfer to the area of the prison with squalid

housing conditions and inhabited by mentally-ill prisoners.).

2. *Attorney Contacts Monitored*

Plaintiff also contends that his right to consult with his attorney privately was infringed upon by the WCDC guards. More specifically, he maintains that three pre-arranged telephone calls to him from Robin Smith, the attorney who represents him in a federal criminal matter in a United States District Court in New York, were monitored by officers in the booking area or supervisor's office—the locations where he received the calls. Plaintiff raised this issue with Major Brenda Downs, who advised him that those calls were not being recorded, but that they would be monitored by the guards.

"[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys" and "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.*" Procunier v. Martinez*, 416 U.S. 396, 419 (1974). To prevail on a § 1983 claim for a violation of the Sixth Amendment, plaintiff must establish: 1)an intrusion into attorney-client communication and 2) some prejudice to him. *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977).

While unmonitored communication between attorneys and clients are important, *see Adams v. Carlson*, 488 F.2d 619, 631 (7th Cir. 1973), in plaintiff's case, he has

offered nothing to suggest that the actions complained of have resulted in prejudice, such as the disclosure of his defense strategy to the federal prosecutors involved in his federal criminal proceedings, much less that it has resulted in any tainted evidence in those proceedings. *See Weatherford*, 429 U.S. at 558 (undercover officer's participation in a meeting between a defendant and his lawyer did not violate Sixth Amendment because the evidence was not tainted, the defense plan was not revealed to the prosecution, and the intrusion was not purposeful).

Absent some kind of claimed interference with his relationship with his attorney or prejudice to his defense, plaintiff fails to state a § 1983 claim for an infringement of his Sixth Amendment right. *See Stanley v. Vining,* ___ F.3d ___, ___, 2010 WL 1610067, at* 2 (6th Cir. Apr. 22, 2010)(where there was no contention that defendant's questioned actions created a barrier to inmate's relationship with his lawyer, there is no cognizable Sixth Amendment claim for deprivation of the right to counsel) (citing *Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974) for its holding that "[a]s to the Sixth Amendment, its reach is only to protect the attorney-client relationship from intrusion in the criminal setting ...")).

C. Claim three (Access to Courts - Law Library).

In support of this claim, plaintiff makes the factual contentions which follow. From July 8, 2003, to the present, plaintiff's access to the law library has been a contentious issue between him and the WCDC authorities, federal and state court judges, and his own attorneys. For example, on April 17, 2008, the trial judge removed plaintiff's attorneys from representing him in his ongoing state criminal case, denied him substitute counsel, and denied him access to a law library. The trial court allowed the Public Defender's Office to supply any case law known to him, but precluded that organization from performing any legal research for plaintiff.

At first, the system created by the trial court to ensure plaintiff access to legal materials was slow—plaintiff did not have immediate access to legal materials known to him—but, by the last of June, plaintiff had the cases he needed to support this civil rights action. The reason given for the delay was that the cases to which he requested access had nothing to do with his state criminal case. To further complicate the issue, the trial judge stayed plaintiff's state criminal case pending a decision of the Criminal Court of Appeals and then stripped him of his right to legal materials. (The Court takes judicial notice that the state appellate court affirmed the trial judge's finding that plaintiff had waived and forfeited his right to an attorney. *See State v. Willis*, 301 S.W.3d 644, 645 (Tenn. Crim. App. 2009)). This trial court's action, plaintiff maintains, was designed to encumber him from filing this instant civil rights lawsuit.

A prisoner has a First Amendment right "to petition the Government for redress of grievances," and this includes a right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). While there is no freestanding right to a law library, *Lewis*, 518 U.S. at 351, a prisoner has a right to meaningful access to the courts. *Bounds*, 430 U.S. at 822. In order to succeed on a claim for denial of access to the courts, a plaintiff must show that the alleged deficiencies in the law library or legal assistance program have actually impeded his efforts to pursue a non-frivolous legal claim regarding his conviction or conditions of confinement. *Lewis*, 518 U.S. at 351 and 360 n.7 (An actual impediment is not shown "simply by establishing that [a] prison's law library or legal assistance program is sub-par in some theoretical sense" or pointing to the "lack of access to adequate library facilities. . . .").

As previously explained, a prisoner must plead an actual legal injury, such as the "late filing of a court document or dismissal of an otherwise meritorious claim," which has been caused by a prison rule or an alleged shortcoming in the law library. *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996)(citing *Lewis*, 518 U.S. at 351). However, once counsel has been appointed, the state has fulfilled its constitutional obligation to provide full access to the courts. *Martucci v. Johnson*, 944 F.2d 291, 295 (6th Cir. 1991); *Holt v. Pitts*, 702 F.2d 639, 640-41 (6th Cir. 1983).

Plaintiff has not alleged anything approaching an actual injury resulting from

the alleged denial of access to a law library.  With respect to his criminal case, plaintiff acknowledges that he was represented by attorneys until April 17, 2008, even though he "believed his lawyers were not doing their job and allowing the State to violate his Constitutional rights and being denied the access to legal material to prove it."  (Am. Compl. at 20).  Until that date, affording him an attorney satisfied the State's obligation to furnish him access to the courts.  While plaintiff is now representing himself in his state criminal matter, he has not shown any actual detriment he has incurred from his restricted access to legal resources, such as the late filing of a court document or the like.  For example, he has not established, or even alleged, that, due to the fact that he must request legal materials from the Public Defender's Office, he has not been able to timely comply with a state court order to file a document, motion, or other paper.  *See Kensu,* 87 F.3d at 175 (finding no prejudice where inmate had access to legal materials by request and had been able to file a timely court-ordered brief).

The same is true in this instant civil case.  Plaintiff has submitted a seventy-two page, single spaced, typewritten complaint, accompanied by weighty filings (7-pounds and twelve ounces), and multiple motions.  While he claims that he would have filed this lawsuit sooner had he not been denied court access, he has not pointed to anything specific to demonstrate that, due to limitations on his usage of a law library, he

incurred a legal detriment to this then-contemplated and now-filed lawsuit.

Finally, plaintiff contends that Sheriff Ed Greybeal is responsible for providing a law library and other help to inmates to attack their sentences and conditions of their confinement in order to access the courts. (Am. Compl. at 21). Apparently, plaintiff is seeking to impose supervisory liability on these officials.

However, this theory is unworkable here because § 1983 liability must be based on more than respondeat superior, or a defendant's right to control employees, *Taylor v. Michigan Dep't of Corrections,* 69 F.3d 76, 80-81 (6th Cir.1995): "[P]roof of personal involvement is required for a supervisor to incur personal liability." *Miller v. Calhoun County*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). Absent some showing that defendant sheriff authorized, approved, or knowingly acquiesced in the alleged wrongful conduct, plaintiff has failed to state a § 1983 claim against him. *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir.1993)*; Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

D.  Claim four (Fourth Amendment).

Plaintiff alleges, in this claim, that defendant Bill Burt, a captain in the Bradley County Sheriff's Department, intentionally provided information which he knew to be false and misleading to obtain a revocation of plaintiff's bond. Although this happened in October, 2002, plaintiff asserts that he continues to suffer from the

claimed violation.  According to plaintiff, defendant Burt's willful presentation of false and misleading evidence to falsely incarcerate him violates the Fourth Amendment and fits within a much larger plan, in which the District Attorney's office and the Washington County Sheriff's Department also participate, for the purpose of trammeling on plaintiff's rights.  Moreover, the initial illegal acts have borne "fruits" which are being used in the criminal proceedings against plaintiff by District Attorney General Tony Clark.[1]  These allegations may advance no further.

This is so because of the doctrine established by *Younger v. Harris*, 401 U.S. 37 (1971).  Under this doctrine, federal courts must abstain from entertaining lawsuits by an individual seeking to enjoin a criminal prosecution against him in state court where those proceedings implicate important state interests and the plaintiff has an adequate opportunity to raise his challenges in that forum.  *See O'Shea v. Littleton*, 414 U.S. 488, 499-504 (1974).

All of the factors supporting abstention are present here.  Plaintiff's trial on four counts of first degree murder and two counts of abuse of a corpse is pending in the

---

[1] Plaintiff's mention of "fruits" likely refers to the rule that evidence is inadmissible if it is "obtained as a direct result of an unconstitutional search or seizure," or if it is "later discovered and found to be derivative of any illegality or fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (internal quotation marks and citations omitted).

state court. Plaintiff may attack in those criminal proceedings the process whereby he was transferred from the New York correctional institution to Tennessee to face the murder charges. Were this Court to find in plaintiff's favor that his presence in Tennessee was secured illegally, this ruling undoubtedly would implicate the State's interest in bringing lawbreakers to justice. Therefore, the Court must abstain from interfering in plaintiff's state criminal proceedings by issuing the requested "stop and desist order" to forestall the admission of certain "fruit" against plaintiff in those proceedings.

There remain the allegations that defendant Burt's actions are part of a larger scheme (i.e., a conspiracy) to violate plaintiff's rights. A civil conspiracy, as explained by the Sixth Circuit, "is an agreement between two or more persons to injure another by unlawful action. *Spadafore v. Gardner,* 330 F.3d 849, 854 (6th Cir 2003) (citing *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). Here, plaintiff claims that a conspiracy to violate his rights existed, but he has not provided any facts to show that there was "a meeting of the minds" between two or more defendants as to *one* plan, *see Spadafore*, 330 F.3d 854, to violate plaintiff's constitutional rights. Moreover, conspiracy claims must be pled with some degree of specificity; vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim. *Id.* Allegations premised upon mere conclusions and opinions, as are these, need not

be accepted as true and, thus, fail to state a claim. *See Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir.1986) (holding that § 1983 complaint must contain factual basis for claims, skeletal allegations of unconstitutional conduct inadequate). Plaintiff's assertion of the existence of a civil conspiracy lacks merit, is conclusory, and fails to state a § 1983 claim for relief.

E.   Claims five, six, seven, eight, nine, ten and eleven (Fourth and Fourteenth Amendments).

In these claims, plaintiff maintains, respectively,

—that the prosecutors in his criminal case have engaged in misconduct involving, *inter alia*, illegal searches and seizures (Claim five);

—that, in October, 2002, his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966),[2] were violated by subjecting him to interrogation, by arranging for Wilda Willis (his former wife) to visit him in jail so as to elicit inculpatory information from him, by "using the fruits of the Willful Constitutional violations to further violate the Plaintiff's Constitutional Rights to due process" (Am. Compl. at 42), and by recording telephone and face-to-face conversations between his ex-wife and him, as well as recording his meetings and visits with his relatives—all with the knowledge and

---

[2] *Miranda* requires law enforcement officers to advise a suspect during custodial interrogation that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id*. at 444.

involvement of the prosecutors (Claims five - seven);

—that an officer, in an attempt to soften up plaintiff and do an end run around *Miranda*, placed plaintiff, who was nude, in a cold cell, without blankets or a bunk, which amounted to excessive force and intimidation (the incident was covered-up later by calling it a suicide watch) (Claim eight);

—that plaintiff was subjected to constitutionally barred interrogation techniques for the purpose of mentally and physically overbearing his will, without the presence of counsel, a constitutional right which he had asserted at one point—all wrongful actions known, directed, or approved by the prosecutors, who intend to use the illegally obtained information at trial (Claims nine, ten); and

—that a multitude of exculpatory evidence was withheld from the grand jury which re-indicted plaintiff on November 3, 2003, and that the prosecutor is engaging in misconduct by using this indictment to further his case against plaintiff (Claim eleven).

As in the prior claim, the *Younger* rule applies here and all the factors which appeared in the earlier claim are present here as well. Therefore, the Court must abstain from interfering in plaintiff's ongoing state criminal proceedings by allowing this claim to proceed. *See Juidice v. Vail*, 430 U.S. 327, 335-36 (1977) (Abstention is mandated whether the state court proceeding is criminal, quasi-criminal, or civil in

nature as long as federal court intervention "unduly interfere(s) with the legitimate activities of the Stat(e).") (quoting *Younger*, 401 U.S. at 44).

F.  Claim twelve (Eighth Amendment).

Many of the facts alleged in this claim are similar to those iterated in support of the second claim, i.e., that defendant Johnson harassed and threatened plaintiff for filing this lawsuit.  Plaintiff maintains that, for twenty-seven days, he sought to right defendant Johnson's wrongful conduct by repeatedly requesting grievances to complain about that conduct, but that another officer issued plaintiff a disciplinary write-up to retaliate against him for asking for grievances.  Plaintiff asserts that he changed his plea to guilty to the disciplinary infraction  because he is "Closter phobic" and because he was told that, if he pled guilty, the fifteen-day lockdown he received for the offense would be cut in half.  Eight days later, he filed this instant action and now fears further reprisals and bodily harm for doing so.

As noted earlier, a prisoner who files a grievance and/or a lawsuit engages in activity protected by the First Amendment, *see McDonald v. Smith*, 472 U.S. 479, 482 (1985) ("The First Amendment guarantees "the right of the people ... to petition the Government for a redress of grievances."), and retaliation for filing lawsuits and grievances violates the Constitution. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001; *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996).  There are several reasons,

however, why plaintiff's contentions fail to state a valid claim for relief under § 1983.

First, the officer who, plaintiff maintains, retaliated against him by issuing him a disciplinary write-up has <u>not</u> been named as a defendant in this lawsuit. Nor has plaintiff claimed that Officer Chad Johnson—the officer who <u>has</u> been named as a defendant, whose conduct generated plaintiff's requests for a grievance and, in turn led to the asserted reprisal—was involved in the purported retaliation. Plaintiff must establish the personal involvement of each defendant in the supposed constitutional deprivation. *Dunn v. State of Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982). He has not done so.

Secondly, it is doubtful that plaintiff has sufficiently alleged any of the elements of a retaliation claim. The disciplinary report, a copy of which plaintiff submitted as Exhibit 79 to his complaint, recites that plaintiff was written up for three disciplinary offenses: (1) Disrespect, a Class II offense, (2) Interference with Officer's Duties, a Class III infraction, and (3) Disruptive Noise or Activity, also a Class III offense. (Am. Compl., Ex. 79). Referenced thereafter is "P # 28 inmate handbook," a copy of which plaintiff has also submitted. (*Id.*, Ex. 94). The conduct which generated the disciplinary report was described thusly:

> "At 06:50 officer Chad Johnson 615 entered C-7 conducting rounds and headcount. All inmates were locked in their cells. After officer C Johnson left C-7 inmate H. Willis constantly got on the intercom insisting that he get a greivance (sic) and or speak to the Sgt. or Lt. about

officer Chad Johnson being anywhere in C-7 in his presance (sic)." (*Id.*) The Disciplinary Board notes, in the report, that plaintiff "denied all charges and stated he did not cuse (sic) them any more than they cussed him." *Ibid*. But a line is drawn through that explanation and underneath the line is written: "inmate changes plea to guilty." *Ibid*.

The plaintiff in *Smith v. Campbell*, 250 F.3d 1032 (6th Cir. 2001), was an inmate legal advisor, who claimed that he had been transferred to another facility at a higher security level to retaliate against him for filing grievances and for his zealous representation of other inmates charged with disciplinary offenses. The district court held that he had not stated a claim for retaliation, and the Sixth Circuit affirmed, agreeing that the plaintiff had a right to file grievances against prison officials, but holding that he exercised that right in a manner which violated legitimate prison rules and objectives and, therefore, was not engaged in protective activity. *Id.* at 1037 (citing to *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir.1995) for its comment that the essence of prison management is the ability to transfer an inmate who is interfering with the administration of the prison and the morale of its staff).

In this case, plaintiff, by his own admission, had cursed staff members and, according to the disciplinary report, had persisted in using the intercom , continuously requesting a grievance form or a tete-a-tete with a superior officer. The inmate

handbook, in the section labeled, "Inmate Code of Discipline," establishes that the actions involved in the three charged offenses are violations of the WCDC rules of inmate conduct. The Sixth Circuit has recognized that, "if a prisoner violates a legitimate prison regulation, he is not engaged in protected conduct and cannot proceed beyond step one." *Thaddeus-X*, 175 F.3d at 395 (internal quotation marks omitted). Behaving in a disruptive and disrespectful manner and impeding an officer's performance of his duties is not conduct that the Constitution protects. *See, e.g.*, *Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003) (no First Amendment violation when inmate transferred for misconduct and infractions of rules, rather than for assertion of his constitutional rights).

The third element—causation—also is missing from the allegations in the complaint. Even if the Court were to assume that plaintiff's conduct was constitutionally sanctioned (which it was not), he must still allege facts showing a causal connection between the protected conduct (filing this lawsuit or a grievance) and the adverse action (issuance of the disciplinary report). *Thaddeus-X*, 175 F.3d at 394 (a plaintiff must show that the adverse action was motivated at least in part by his protected conduct). The sequence of events claimed here cannot make that showing.

The issuance of the disciplinary report was not tied to the filing of this lawsuit because the suit was filed after plaintiff was issued the report, had a hearing on the

34

report, and had fully served the 7.5 day lockdown imposed as punishment for the offense. Plaintiff claims that the retaliation was also due to his filing a grievance, but his contentions likewise do not support that he filed a grievance concerning the harassment to which he was being subjected by defendant Johnson before he was written up for the disciplinary offense. Indeed, plaintiff's disciplinary report involved the untoward behavior in which he engaged because he had not been given a form to file a grievance. *See Stanley v. Litscher*, 213 F.3d 340, 343 (7th Cir. 2000) (First amendment not violated when inmate was allegedly transferred to another prison for expressing disagreement with prison officials' action because claimed retaliatory events preceded grievances).

### III. **The Motions**

After filing the complaint, plaintiff filed several motions—a motion to appoint counsel, a motion for an emergency show cause hearing, an amended motion for an emergency show cause hearing, and a motion for a temporary restraining order. Some have been combined for purpose of organization.

A. Motion for Appointed Counsel & Motion for Emergency Show Cause Hearing (Docs. 4, 5).

These two motions were signed on plaintiff's behalf by R. W. Warfield, who is not a licensed attorney in Tennessee and who, thus, cannot file motions for or act

on plaintiff's behalf.   Therefore, the Clerk is **DIRECTED** to **STRIKE** these motions.

B.  Amended Motion for Emergency Show Cause Hearing (Doc. 9).

As a basis for plaintiff's motion for an emergency show cause hearing, he claims that he is suffering from a lack of medical care and is in imminent danger of reprisal from the WCDC employees for filing this complaint.  Plaintiff further alleges that he has been accused, wrongfully, of delaying his state criminal case, though he only seeks a disposition of his case within the bounds of the law.  According to the motion, the local authorities have been obsessive in pursuit of plaintiff's prosecution, have ignored exculpatory evidence, and have operated outside of the bounds of the law.  Finally, plaintiff urges the Court to grant his motion for the appointment of counsel, specifically, Attorney Gerald Gulley, this motion, and, by reference, his motion for a temporary restraining order (TRO).

First of all, plaintiff's motion for appointment of counsel has been denied (Doc. 13), and his motion for a TRO will be discussed in the following section of this order. Secondly, this Court cannot hold an emergency show cause hearing with respect to matters involved in his current state criminal case because, as explained above,  the *Younger* doctrine applies and calls for this federal court to abstain from interfering in those ongoing state criminal court proceedings.

Third, plaintiff's claim that he is suffering from a lack of medical care is conclusory because the motion contains no allegations of fact to support that claim. However, to the extent that the claim relates to the medical claims raised in his complaint, the Court addressed those claims earlier in this order. Plaintiff's allegation that he is in imminent danger of reprisals is also conclusory because it too lacks any factual contentions to support an inference that plaintiff will be retaliated against based on the filing of this lawsuit.

In sum, the Court finds that plaintiff has established no valid reason for an emergency show cause hearing and, therefore, his motion for such a hearing is **DENIED**. (Doc. 9).

C. <u>Motion for a Temporary Restraining Order & Amended Motion for a Temporary Restraining Order (Doc. 10 & Attach. 3).</u>

In this motion, plaintiff seeks a TRO, directing Washington County Sheriff Ed Greybeal and District Attorney General Tony Clark to move him from the WCDC to the custody of the United States Marshals or to some other facility pending a hearing in this case. As support for his motion, plaintiff maintains that he has pain in his back and left leg and other medical problems, including a cyst on his foot for which he has needed care since 2004, and that he was abused to the point that he refused to go anywhere with the transport officers to get treatment. Plaintiff reiterates his claims

against defendant Johnson, arguing that he was locked down to retaliate against him for being persistent in his effort to document the facts concerning the incident involving legal mail and that he is in imminent danger of further reprisals for filing this lawsuit, as his attached affidavit makes clear. Plaintiff also restates claims allied with his state criminal case, specifically alleging that his indictment was illegal and obtained with perjured information, that the authorities are obsessed with prosecuting him, and that the writ of habeas corpus *ad prosequendum* used to bring him to Tennessee to stand trial is void because the WCDC authorities have failed to abide by one of its terms, i.e., to provide plaintiff care commensurate with that required by the U. S. Marshals Service policy.

In his amended motion for a TRO, plaintiff claims that retaliation by design to punish him has increased and is being directed by the Jail Administrator, Major Brenda Downs, who has not been named as a defendant. Plaintiff further asserts that organized efforts have been made to obstruct him from filing this lawsuit and that these efforts stem from a direct and calculated conspiracy of WCDC officials to violate his civil rights. The central factual allegations offered to support the claim of a conspiracy involve a supposed plan to exacerbate a medical condition of plaintiff by manipulating his housing assignment. More specifically, plaintiff maintains that the authorities assigned an inmate to share his cell, knowing that plaintiff is

claustrophobic and that this particular housing arrangement would cause him physical and psychological stress.[3]

Plaintiff has in his possession eight large storage boxes of official documents, which he keeps in his cell.  Those documents relate to plaintiff's state criminal case, in which he is acting *pro se*, and that fact, inferentially, necessitates his keeping the boxes close at hand, despite the space restrictions in his cell.  Plaintiff was housed alone in a cell within the general population area of the WCDC until April 29, 2009. On that date, Lt. Minthorne placed another inmate in his cell.  The other inmate slept on the floor in a plastic boat.  The placing of the plastic boat in the cell, which already contained the aforementioned boxes, left plaintiff with only a small path to walk to the toilet and the cell door.  Even worse, plaintiff is locked down in the cell twenty-two hours per day.  Plaintiff developed physical and mental stress as a result of these living conditions, and the stress continued until the other inmate was moved out of the cell several days later.

Plaintiff also developed headaches from the stress and did not see a doctor until

---

[3] Some of the allegations about the cell-assignment conspiracy involve actions which are claimed to have occurred in 2007, but because these stale and also time-barred events cannot support issuance of a TRO, the Court simply notes them in passing.  The same is true of the two sworn statements by fellow inmates concerning those same stale actions.  (Doc. 10, Attach. 3, Affidavit of Scott Sutfin and Affidavit of Dana Gregory).

May 14, 2009, though he had filed three sick call requests during the interim. Plaintiff alleges that, during this period (April 29 through sometime in May of 2009), he could not release or receive legal papers through his preacher Roger Warfield and that he was denied the necessary envelopes and postage to mail them to the minister. Plaintiff points to another instance of petty harassment to show the existence of a conspiracy to impede his litigation activities by subjecting him to stressful events: He was awakened at 3:40 a.m. by guards performing a maintenance check. They asked such questions as to whether his water worked, etc., even though he has only six hours in which to sleep, since the main lights are on 18 hours a day.

Plaintiff has provided his own affidavit in support of his motion. (Doc. 10, Attach. 2). In that document, plaintiff avers that his complaints of back problems are legitimate, that he is in severe pain, which would be relieved through dispensing to him 800 m.g. of Ibuprofen daily—a simple, non-narcotic, and cheap remedy; that, though his foot has improved over the years, he needs care for it, but refuses to be transported to get that medical care due to being abused and threatened by the WCDC employees; that he is in need of other medical care, some of which is identified in the complaint and some of which is unidentified in the complaint but disclosed in his motion for a TRO; that he was placed in lockdown when he insisted that he be allowed to document defendant Johnson's threats of bodily harm; and that he is

genuinely in fear that these threats will be acted on by WCDC employees.

His final set of contentions are that defendant Southern Health Partners was negligent in placing defendant Nurse Draper is charge of WCDC inmates' medical care because she is an LPN, and not an R.N. as is required; that the corporate defendant terminated defendant Draper; that the WCDC hired her as a guard (her husband is a guard also); that the guards and supervisors' motive for covering up for defendant Draper was to hide the fact that she is not an R.N.; and that the cover up is responsible for plaintiff's being abused.

Rule 65(b) of the Federal Rules of Civil Procedure provides that:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint, that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition[.]

It is a plaintiff's burden to prove he is entitled to a TRO. *Helling v. McKinney*, 509 U.S. 25, 35 (1998). In determining whether to grant a request for preliminary relief, the following four factors must be considered: (1) whether plaintiff is likely to succeed on the merits; (2) whether plaintiff will suffer irreparable injury in the absence of an injunction; (3) whether the injunction will cause substantial harm to

others; and (4) whether the injunction would serve the public interest. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir.2002) (citations omitted).

On balance, plaintiff has failed to show injunctive relief should be granted. It is unlikely that plaintiff would succeed on his conspiracy allegations for the same reasons that the conspiracy claim raised in the complaint faltered. As explained earlier, the showing to be made to sustain a claim of a civil conspiracy is the existence of "an agreement between two or more persons to injure another by unlawful action." *Spadafore*, 330 F.3d at 854. Plaintiff has not demonstrated that two or more defendants had a "meeting of the minds" as to a single plan. Moreover, a conspiracy claim must be supported by somewhat specific allegations of fact. While plaintiff has recounted, in painstaking detail, disparate events and actions involving his confinement conditions, he has failed to show any nexus between those conditions and a conspiracy. His characterization of those incidents and associated conduct as conspiratorial acts is based merely on his own opinions and conclusions.

Nor has plaintiff demonstrated the remotest possibility that "immediate" and irreparable harm will occur if injunctive relief is not granted. With the exception of his claim about a cyst on his foot, his assertions of constitutional medical mistreatment and retaliation have been addressed and only one states a colorable § 1983 claim. As

to the "foot" contentions, according to his affidavit statements, it has improved, and even though he still needs care for his foot, he has declined transportation which would allow him to receive the medical care. His complaints about his housing arrangement as it impacts his claustrophobia relate to past events and all of those appear to have been resolved. The assertions of a cover up involving defendant Draper's nursing credentials which somehow constitutes a part of a conspiracy make absolutely no sense. And the alleged deprivation of legal mail ended in May, 2009. At any rate, plaintiff has not and cannot "clearly show that immediate and irreparable injury, loss, or damage," *see* Rule 65(b)(1)(A), will result from the alleged wrongful actions.

And, while it appears no third parties would be harmed if the preliminary injunction were issued, neither does it appear that any public interest would be served. Indeed, it might unduly restrict the discretion of the state authorities who have brought plaintiff to this state to prosecute him on serious criminal charges to house him in the county where most of not all of the claimed illegal acts occurred and also subject their housing decisions to premature judicial oversight. In short, plaintiff has not borne his burden for issuance of a TRO. Hence, the motions are **DENIED** for his failure to show his entitlement to injunctive relief. (Doc. 10).

## IV. **Conclusion**

To sum up, only the allegations involving Hepatitis A and B vaccinations will be allowed to proceed in this cause. Accordingly, the Clerk is **DIRECTED** to send plaintiff a service packet for defendant nurse Daniell Draper. (The packet contains a blank summons and USM 285 form.) Plaintiff is **ORDERED** to complete the service packet and to return it to the Clerk's office within twenty (20) days of the date on this Order. Plaintiff is forewarned that failure to return the completed service packet within the time required could jeopardize his prosecution of this action.

When the completed service packet is received by the Clerk, the summons will be signed and sealed by the Clerk and forwarded to the U.S. Marshal for service upon defendant Draper. Defendant is **ORDERED** to respond to the complaint in the manner and within the time required by the Federal Rules of Civil Procedure.

Plaintiff is **ORDERED** to inform the Court of any address change within ten (10) days following such change. He is further cautioned that his failure to do so will result in a dismissal of this action for failure to prosecute.

Finally, since there are insufficient or no allegations connecting the remaining defendants to any constitutional wrongdoing (aside from the ones which are subject to the *Younger* doctrine) and since, in any event, the theory of respondeat superior, or an employer's right to control its employees, cannot provide a basis for § 1983

liability, all defendants, save defendant Draper are **DISMISSED** from this action for

failure to state a claim against them.  Fed. R. Civ. P. 12(b)(6).


      **ENTER**:


s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
